IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **LISA PHELPS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 13-cv-1211-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Lisa Phelps, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Ms. Phelps applied for DIB in August, 2010, alleging disability beginning on September 1, 2009.  (Tr. 13).  After holding an evidentiary hearing, ALJ Michael Scurry denied the application for benefits in a decision dated September 4, 2012. (Tr. 13-26).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 19.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ's credibility analysis was erroneous in that he erred in assessing the side effects of plaintiff's medications and mischaracterized other evidence.

3. The ALJ erred in weighing the opinions of two of her treating physicians, Drs. Robson and Schenewerk.

**Applicable Legal Standards**

To qualify for DIB a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v.*

*Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Phelps was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However,

while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined that Ms. Phelps had worked since the alleged onset date, but this work did not rise to the level of substantial gainful activity. She was insured for DIB only through December 31, 2009. He found that plaintiff had severe impairments of Parkinson's disease, Crohn's disease, asthma, obesity, degenerative disc disease of the lumbar spine, fibromyalgia, diabetes mellitus type II, with peripheral neuropathy, anxiety disorder, and depression. He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Phelps had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work as bartender or department manager. However, she was not disabled because she was able to do other jobs which exist in significant numbers in the national and regional economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff and is limited to the relevant time period.

 1. **Prior Denial**

Ms. Phelps filed a prior application for DIB in June, 2005. After an evidentiary hearing, an ALJ denied the application in a written decision dated August 27, 2009. Plaintiff did not appeal. (Tr. 102-111, 172).

That decision is *res judicata* and stands as a finding that plaintiff was not disabled as of August 27, 2009. Thus, while the Court may consider medical evidence which predates August 27, 2009, it must accept the Commissioner's decision that Ms. Phelps was not disabled as of that date. See, *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998); 20 C.F.R. § 404.988.

 2. **Agency Forms**

Plaintiff was born in 1966. She was 43 years old on the alleged onset date of September 1, 2009. She was insured for DIB through December 31, 2009. (Tr. 172).

In August, 2010, plaintiff was 5' 6" tall and weighed 235 pounds. She said she stopped working on December 21, 2004, because of her condition. (Tr. 175-176). She had worked as a cook and bartender, and as a manager of a farm store. She had completed two years of college. (Tr. 177).

In September, 2010, Ms. Phelps stated in a Function Report that she was unable to concentrate and became confused and disoriented. Her tremors worsened when she was anxious. She was always short of breath. She alleged

pain in her legs, back, feet and arms, and moderate to extreme muscle and joint paint. She could not walk well and had trouble with her hands. Crowds, new tasks and new people brought on anxiety. She was fatigued. She was easily angered and agitated, and did not adapt to change. During the day, she watched TV, napped and walked to relieve her chronic pain. She did not do housework or fix meals. She rarely left home because of panic and anxiety. She was taking Ambien, Flexeril, Xanax, Lasix, and Remeron. She alleged that all of these drugs, except for Lasix, caused her drowsiness. (Tr. 191-200).

### 2.  Evidentiary Hearing

Ms. Phelps was represented by an attorney at the evidentiary hearing on July 26, 2012. (Tr. 70).

Plaintiff was 46 years old. Her husband, whom she had married in 2000, had been disabled since 1993. He had been a coal miner, and had suffered back injuries and a heart attack. Her 21 year old daughter lived with them. (Tr. 74-76).

Ms. Phelps testified that she suffered from a number of physical and mental conditions at the time of the hearing. She said she did not do any household chores and her house was a "disaster" and "filthy." (Tr. 87-88). Her Crohn's disease and tremors had gotten worse over the years. The tremors had been at pretty much the same level for the past two to three years. (Tr. 90-91).

A vocational expert (VE) also testified. The ALJ asked him several hypothetical questions. In one questions, the ALJ asked him to assume a person

who could do work at the light exertional level, with no exposure to fumes, odors, and similar irritants, limited to work involving simple, repetitive tasks with no more than average productions standards, no contact with the public, and only occasional contact with supervisors and coworkers. The VE testified that this person could not do plaintiff's past work, but could do other jobs such as housekeeper and hand packer. (Tr. 93-94).

### 4. Relevant Medical Treatment

Plaintiff was treated by Dr. David Robson at St. Louis Spine Care Alliance in 2009 and 2010. On July 15, 2009, she complained of low back pain radiating into her right leg. On exam, her gait was normal. She had no muscle spasms. Straight leg raising was positive at 80 degrees. Neurologic exam including motor, sensory and deep tendon reflexes was normal in both lower extremities. An MRI showed multilevel degenerative changes and mild spondylolisthesis at L4. He recommended an epidural steroid injection. (Tr. 348). On August 11, 2009, Dr. Robson noted that she had done "extremely well" following the injection, and she was continuing to improve. Straight leg raising was negative. She had no muscle spasms. Her gait was normal. Neurologic exam was normal. (Tr. 347). She returned to Dr. Robson in 2010, after the date last insured for DIB, complaining of neck pain. He noted that she had undergone a cervical fusion about three years prior. (Tr. 750).

On October 30, 2009, an arterial Doppler study of Ms. Phelps' legs was normal. (Tr. 306).

Plaintiff received mental health treatment from Community Counselling Center. She saw Dr. Khot there on September 15, 2009. She reported that she was stressed because her "SSD" application had been turned down. Her medications reduced her symptoms but did not "improve occupational functioning." She had "no other side effects of meds." She was to continue taking Cymbalta, and to take Xanax and Vistaril as needed for anxiety and Ambien as needed for insomnia. (Tr. 417). On December 10, 2009, she was again "stressed over SSD." Her symptoms had improved on medications. She had no side effects. Her medicines were continued. (Tr. 416). Dr. Khot prescribed Remeron. (Tr. 415). In March, 2010, Dr. Khot noted that Remeron was helping her sleep and she needed less Ambien. He again noted that she had no side effects from her medications. He advised her to discontinue Ambien because Remeron was helping her sleep. (Tr. 414). In July, 2010, Dr. Khot noted that she was doing well. Her affect and mood were cheerful. She had no side effects from her medications. (Tr. 412).

Christopher Schenewerk, M.D., was plaintiff's primary care physician in 2009. His office notes are located at Tr. 478-619. He used a form to record the notes of office visits. The narrative remarks in the notes are brief. In May, 2009, Dr. Schenewerk prescribed Neurontin for pain in her legs. (Tr. 532). On June 1, 2009, plaintiff complained of numbness in her right leg and shooting pain in her thigh. Dr. Schenewerk noted that her pain was better with Neurontin. (Tr. 528). In July, 2009, she was having lumbar pain and was to see an orthopedic specialist.

(Tr. 521). On July 30, 2009, Dr. Schenewerk saw her to review lab work. He circled the phrases "no complaint" and "tolerating meds" on the form. (Tr. 519). On September 3, 2009, Neurontin was discontinued and she was started on Lyrica because Neurontin was causing memory loss and slow speech. (Tr. 518).

When Dr. Schenewerk saw her on October 15, 2009, she again complained of leg pain and numbness. He recommended that she increase her Lyrica. He wrote "referral Neuro." (Tr. 517). In November, 2009, Dr. Schenewerk noted that her leg pain was decreased with Lyrica, but her diabetes was uncontrolled. He again circled "tolerating meds." (Tr. 513-514).

Ms. Phelps was admitted to Red Bud Regional Hospital through the emergency room on November 18, 2009, for evaluation of chest pain. Cardiac work-up indicated that she did not have a heart attack. She was discharged to home the next day. (Tr. 363-386).

Plaintiff saw Dr. Schenewerk on November 30, 2009. She complained of chest and thoracic pain, which the doctor attributed to her large breasts. She wanted breast reduction surgery. He again circled "tolerating meds." (Tr. 511-512). Ms. Phelps had consulted with a surgeon, Dr. Linda Camp, about a month prior. Dr. Camp recommended breast reduction surgery. (Tr. 611). In February, 2010, her blood sugars were running high. She had been on oral medication, but was to begin using injections. (Tr. 507-508).

Pandurange Kini, M.D., a neurologist, saw plaintiff on September 8, 2010. She presented with a number of complaints, including trouble swallowing, loss of

facial expression, extreme sweating, and neck and back pain. Her neurological exam was unremarkable except for some decreased pinprick in the feet and the left calf. Dr. Kini wrote a letter to Dr. Schenewerk detailing his findings. He wrote, "I do not find anything wrong with her to explain her symptoms." (Tr. 592-593).

### 5. Opinions of Treating Doctors

Dr. Schenewerk wrote an undated letter stating that Ms. Phelps "is permantly [sic] disabled due to her history of chronic leg pain, secondary to her peripheral neuropathy." He stated that her medications caused her fatigue and sleepiness. (Tr. 613).

In December, 2010, Dr. Robson completed a form assessing plaintiff's physical ability to do work-related activities. He indicated that plaintiff could lift only 5 pounds. She could stand/walk for 30 minutes at a time and a total of 2 hours a day. She could sit for 30 minutes at a time and a total of 2 hours a day. She could never climb, balance, stoop, crouch, kneel or crawl. She was not limited in her ability to reach or push/pull, but was limited in ability to handle, feel, see, hear and speak. She should avoid temperature extremes, but could be exposed to workplace hazards and environmental irritants. The doctor initially wrote that these limitations began on December 29, 2010. He wrote a line through that date, and wrote in September 17, 2007. (Tr. 743-745).

In January, 2011, Dr. Schenewerk completed a similar form. He indicated that plaintiff could frequently lift 10 pounds. She could stand/walk for 15 minutes at a time and a total of 1 hour a day. She could sit for 30 minutes at a time and a

total of 3 hours a day. She could never climb, balance, kneel or crawl, and could stoop and crouch only occasionally. She was limited in her ability to reach, handle, feel, push and pull. She should avoid workplace hazards and environmental irritants. The doctor indicated that these limitations began in 2004. (Tr. 759-761).

## Analysis

In a DIB case, a claimant must establish that she was disabled as of her date last insured. *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). It is not sufficient to simply show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

In general, plaintiff's arguments ignore the fact that only a small window of time is relevant here. The final decision denying her prior application stands as a finding that plaintiff was not disabled as of August 27, 2009, and she was insured only through December 31, 2009. Therefore, the relevant time period is from August 27, 2009, through December 31, 2009. This is not to say that medical treatment rendered after the date last insured cannot be considered; it can, so long as it helps to illuminate her condition during the insured period. However, later medical evidence is of little relevance where it shows that the plaintiff's condition worsened after the date last insured. See, *Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012). Here, the ALJ did, in fact, discuss medical records from after the

date last insured.  Plaintiff does not argue that the ALJ failed to consider relevant records.

Plaintiff attacks the ALJ's credibility analysis on narrow grounds.  She first argues that the ALJ failed to sufficiently consider her claims of side effects from her medications.

The ALJ noted that plaintiff claimed to have side effects from her medications, but she told Dr. Khot that she had no side effects in August, 2010.  Plaintiff argues the ALJ incorrectly perceived this as a contradiction.  She argues that Dr. Khot was concerned only with her psychiatric medications.  However, plaintiff alleged that she had side effects from her psychiatric medications.  See, Tr. 199, 223.  Her statement to Dr. Khot conflicts with that allegation.  She also argues that Dr. Khot's records confirm that Ambien and Remeron were causing the "side effect" of drowsiness.  This argument is nonsensical.  Dr. Khot prescribed Ambien and Remeron to help her sleep.  (Tr. 414).  Drowsiness is the intended effect, not a side effect.

Plaintiff cites to a number of her statements made in forms submitted to the agency and in her testimony about alleged side effects.  She argues that the case should be remanded for consideration of the effect of her medications on her RFC.  The problem with this argument is that the statements were made after her date last insured, and none of those statements are directed to the period from August 27, 2009, through December 31, 2009.

Ms. Phelps argues that the ALJ placed too much emphasis on the fact that

she took trips to Hawaii and Las Vegas during the time she claims she was disabled. She is incorrect. SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). ALJ Scurry was entitled to consider the fact that plaintiff's decision to travel to Hawaii and Las Vegas contradicted her allegations of very limited ability to do much of anything, including leaving her house and going to new places.

Plaintiff also takes issue with the ALJ's reliance on a statement in the records that she had been a caretaker for her disabled spouse and her statement to a doctor that her daughter did the household chores. This is nit-picking. Plaintiff's argument fails to confront the ALJ's credibility analysis as a whole, and it therefore is not persuasive.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical

evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.  Further, "an ALJ's credibility findings need not specify which statements were not credible."  *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012).

ALJ Scurry gave a number of reasons for his credibility findings.  He noted that she had a sporadic work history, that the objective medical evidence did not support her claim of disability, that she made several inconsistent statements, and that she engaged in daily activities that conflicted with her reported level of functioning.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).  Here, the ALJ's analysis is far from patently wrong.  It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony.  *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

That leaves only the argument that the ALJ erred in not giving more weight to the opinions of Drs. Robson and Schenewerk.  The ALJ gave a number of reasons for discounting these opinions.  He rejected Dr. Schenewerk's opinion because his opinion was rendered after the date last insured, touched on an issue reserved to the Commissioner, and it was not consistent with his own records or other medical records in the file.  ALJ Scurry rejected Dr. Robson's opinion for similar reasons.  See, Tr. 23.

Plaintiff's only criticism of the ALJ's analysis is that he cited the fact that the opinions were rendered after the date last insured.

A treating doctor's medical opinion is not automatically entitled to controlling weight. Rather, it is to be afforded controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

"[W]hile the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in 20 C.F.R. §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(c). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th

Cir. 2007). Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Here, ALJ Scurry easily met and exceeded the "minimal articulation" standard. Plaintiff takes issue only with his consideration of the dates on which the opinions were rendered. She does not argue that the ALJ was incorrect about the dates on which the opinions were rendered; she complains only that the ALJ should only have considered that both doctors said that the limitations they identified were present before the date last insured.

Drs. Schenewerk and Robson did, in fact, render their opinions long after plaintiff's date last insured. Plaintiff offers no support for her suggestion that the ALJ was not allowed to consider that fact. She does not take issue with the other reasons given by the ALJ for the weight he assigned to the opinions. Accordingly, the Court concludes that she has not demonstrated any error committed by the ALJ.

In short, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether Ms. Phelps was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d

306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Scurry committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Lisa Phelps' application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE:** December 23, 2014.

s/ Clifford J. Proud
**CLIFFORD J. PROUD
UNITED STATES MAGISTRATE JUDGE**
